**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

**HEARTLAND BARGE MANAGEMENT, LLC,**

Plaintiff,

v.

**FIVE-S GROUP, L.L.C.,**

Defendant.

Case No. __________

**COMPLAINT IN ADMIRALTY**

**RULE 9(h) DESIGNATION**

## <u>COMPLAINT</u>

Plaintiff Heartland Barge Management, LLC ("Heartland"), for its Complaint against Defendant Five-S Group, L.L.C. ("Five-S"), alleges as follows:

## PARTIES

1. Plaintiff Heartland Barge Management, LLC is a Delaware limited liability company. Its principal place of business is in Columbia, Illinois.

2. Defendant Five-S Group, L.L.C. is a Louisiana limited liability company. Its principal place of business is in Baton Rouge, Louisiana.

## JURISDICTION, VENUE AND RULE 9(h) DESIGNATION

3. This action arises from a contract of affreightment ("the contract") regarding the movement of sand by barges on the navigable waters of the United States and is therefore a civil action within the admiralty and maritime jurisdiction of the United States.

4. This Court has subject-matter jurisdiction under 28 U.S.C. § 1333.

5. The contract contains a forum selection clause designating this court as the forum for resolving any dispute related to the contract, thereby

establishing this Court's personal jurisdiction over Five-S as well as venue in this Court.

6. Pursuant to Federal Rule of Civil Procedure 9(h), Heartland designates this action as an admiralty or maritime claim for purposes of Rules 9(h), 14(c), 38(e), and the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.

**FACTS COMMON TO ALL COUNTS**

7. Starting in or around mid-February, 2026, prior to March 23, 2026 when Heartland sent proposed pricing to Five-S, a representative of Heartland had a series of telephone calls with a representative of Five-S regarding the scope and requirements of certain work Heartland was negotiating to perform for Five-S involving movement of sand by barge from Cow Bayou to Cameron, Louisiana.

8. During the foregoing conversations, Five-S represented to Heartland that: (a) it had contacted the operator of the swing bridge through which the barges had to travel to reach the loading area on Cow Bayou, a tributary of the Sabine River, had also contacted government officials with funding oversight for bridge operations, and had been assured that the bridge would remain open continuously so as not to delay barge movements; (b) Heartland's towing vessel could place all six empty barges along the loading area at one time, with two vessels placed for loading simultaneously; (c) water depth at the loading area would be at least 10' 3" and suitable for marine operations; and (d) the towing vessel delivering the six loaded barges to the

unloading location at Cameron, Louisiana, could safely land them along a 2000-foot long bulkhead next to the unloading slips.

9. During a Teams meeting on March 31, 2026, after Heartland submitted its pricing but before signing a contract for the work, Five-S's representative additionally represented to Heartland that (a) the swing bridge located on the approach to the Cow Bayou loading area could accommodate three barges at a time, so that the towing vessel moving the barges would only need to make two trips to move all 6 barges to and from the loading area, and (b) that boats arriving at the Cameron destination could secure their six loaded barges to the 2000-foot bulkhead and move them 2 at a time into adjacent slips for unloading.

10. Heartland relied on the representations described in Paragraph 8 above in calculating and submitting its freight bid for the barge-transportation work. Heartland relied on the representations described in Paragraph 9 above in signing the written contract for the work on April 1, 2026. Heartland's reliance was reasonable because (a) the origin where the barges were to be loaded was not a regular barge loading facility and Heartland had never sent barges there previously, and (b) the destination was the site of a new facility in the early stages of construction; thus, Heartland had never previously sent barges to that location either.

11. Heartland and Five-S proceeded to enter into a contract of affreightment pursuant to which Heartland agreed to provide the aforesaid barge-transportation services for Five-S. The contract was executed by Five-S

on March 26, 2026 and by Heartland on April 1, 2026. A true and correct copy of the contract is attached to the Complaint as Exhibit A.

12. Among other items, the contract (a) stated that Heartland would provide two boats and twelve barges (six barges per boat) to move the sand from origin to destination (page one), (b) specified a base rate of $4.10 per ton for moving sand from Cow Bayou to the project site (page 2), and (c) allowed Five-S a total of 48 hours to load each group of 6 barges at Cow Bayou and unload them at the project site after which Five-S would be charged $375 per hour (commonly called "demurrage") calculated pursuant to a debit and credit system (pages one and two). The Special Navigation Terms section permitted Heartland to also recover "any additional fees for delays." The Ice/Navigation clause required the Shipper (Five-S) to reimburse Heartland for charges from towers for handling barges during interruptions in navigation.

13. In addition, Paragraphs 1 and 12 of the Standard Terms and Conditions attached to the contract required Shipper (Five-S) to handle all loading of cargo at origin and unloading at destination in a manner that was safe "so as not to cause damage to the barge, cargo, or other property, or injury or death, or violation of any law.".

14. The contract contained a cancellation clause that states, "If this contract is cancelled the Shipper will be responsible for any costs associated with barges that have been placed or assigned for this service."

15. The first boat Heartland provided arrived at the Cow Bayou origin on or about April 20, 2026.

16. Contrary to Five-S's pre-bid representations, the boat's crew discovered on arrival that the swing bridge located on the approach to Cow Bayou operated only during daylight hours rather than continuously and only permitted passage of one barge at a time, not three, causing substantial delays to barge movements. The crew also discovered that the loading area could accommodate only two barges at a time, rather than all six barges as Five-S had represented, that the depth of the water at certain places in and around the loading area was less than 10' 3" and that the only manner of securing most of the barges was to tie them to trees which is an unsafe and unacceptable practice.

17. The first boat together with its tow of six loaded barges arrived at destination on or about April 22, 2026.

18. Contrary to Five-S' pre-bid representations, the boat crew discovered on arrival that the bulkhead where Heartland was told all six loaded barges could be landed was under construction with pipes sticking out horizontally toward the water, making it impossible to land the full tow. This meant the arriving vessel could not land safely, and once stopped would need to hold the six arriving loaded barges in the water near the project site while a separate assist boat moved the loaded barges into the unloading slips two at a time.

19. Because there was no place at origin or destination to safely moor the barges, Five-S breached its obligation to ensure that the loading and

unloading of the barges would occur in a way so as not to cause damage to the barge, cargo, other property, or injury or death, or violation of any law.

20. Heartland promptly advised Five-S of the changed situations at origin and destination. Heartland recommended that Five-S authorize the hiring of an assist boat to be stationed at origin to help move barges through the swing bridge when it opened and help shift barges in and out of the loading area. Heartland recommended that Five-S authorize the hiring of an assist boat to be stationed at destination to take barges from the arriving tow and shift them into the slips for unloading, because of the inability of the arriving boat to tie off the tow and perform that shifting itself.

21. Without the use of assist vessels, Five-S would incur substantial Standby/Delay charges at the rate of $375.00 per hour under the terms of the contract and cause late delivery of cargoes in violation of Five-S's delivery schedule with its customer. In addition, without the use of assist vessels, the process of loading and unloading could not be performed safely, as the contract required.

22. On or about April 28, 2026, Five-S authorized Heartland to hire assist boats to help at origin and destination as needed.

23. Heartland promptly obtained cost figures for the assist boats and provided those figures to Five-S. Heartland then hired one assist boat to be stationed at origin and one assist boat at destination.

24. In early May, 2026 Five-S decided that instead of having Heartland charge Five-S separately for the assist boats, Five-S would prefer to have

Heartland simply increase the base rate of $4.10 per ton to an amount that was adequate to cover the additional cost of the assist boats. On or about Friday, May 15, 2026 Five-S acting through its authorized agents including its then General Counsel Chris Caswell authorized Heartland to increase its base freight rate from $4.10 per ton to $5.93 per ton in lieu of separately invoicing the additional assist-vessel charges.

25. On or about Monday, May 18, 2026, Heartland sent Five-S a revised contract of affreightment to reflect the new rate. Mr. Caswell left Five-S' employment on or about May 31, 2026 before Five-S signed the new contract.

26. In reliance on Five-S's agreement to compensate Heartland for the additional work and costs, Heartland continued providing transportation services including the services of assist boats. In early June, 2026, Heartland submitted invoicing to Five-S at the modified freight rate to which the parties agreed.

27. On or about June 15, 2026, after the departure of its General Counsel Chris Caswell, Five-S' Senior Vice President of Operations notified Heartland by letter that because Five-S had not signed the revised contract containing the new base rate, Five-S would not pay the most recent Heartland billings reflecting that new rate.

28. On or about June 22, 2026 Five-S' Assistant General Counsel Kate Ruocco wrote to Heartland to suggest that the parties terminate their contract early. Because of Five-S' refusal to pay the modified freight rate agreed to on May 15, 2026, Heartland agreed to the early termination proposal, so long as

Five-S, among other things, paid all outstanding freight charges and reimbursed Heartland for expense incurred for assist vessels, fleeting and switching.

29. Heartland's movements of sand ended on or about June 28, 2026. When the work ended, Five-S initially withheld payment not only of the cost of the assist boats, but also $1.9 Million that Five-S admitted it owed for shipments completed at the original base rate of $4.10 per ton plus demurrage owed on those shipments. Eventually, on or about August 25, 2026 Five S paid the $1.9 Million undisputed amount but continued to refuse all Heartland demands to pay for the costs of the assist boats that Five-S authorized on April 28, 2026.

30. The contract between the parties required Five-S to pay (a) all Heartland legal costs including attorneys' fees "incurred in seeking collection of any unpaid freight, demurrage and/or related charges" and (b) interest at the rate of one and one-half percent (1 and ½ %) per month on all Heartland invoices not paid within 30 days (standard terms and conditions paragraph 5).

31. At the time of filing this Complaint, Heartland has incurred the following amounts relating to its performance of work for Five-S that remain unpaid: (a) costs for assists boats and barge fleeting and switching in the total sum of $428,820.75; (b) costs incidental to Five-S' early termination of the contract in the sum of $302,904.47 consisting of demobilization expenses of $173,704.47 and lost revenue for the barges assigned to the Five-S contract until Heartland could locate other work for them in the amount of

$129,200.00; (c) interest in the sum of $65,913.43 computed at the rate of 1 and ½ percent per month on the sums described in subparagraphs (a) and (b) above plus the period of time in excess of 30 days when Five-S withheld payment of the undisputed $1.9 Million, which interest will continue to accrue until the principal sums owed are paid, and (d) legal costs including attorneys' fees that currently total $10,010,00 and will continue to grow as this litigation progresses.

**COUNT I**
**BREACH OF CONTRACT**

32. Heartland incorporates by reference the allegations in paragraphs 1-31 of the Complaint.

33. Five-S breached its obligations concerning loading and unloading of the barges by failing to provide berths permitting the loading and unloading to occur without damage to the barges, other property, or injury or death, or violation of any law.

34. Five-S's refusal to pay the charges for the assist tugs is a breach of the original affreightment contract, the modified affreightment contract to which Five-S agreed, and its separate promise to reimburse Heartland for the charges.

35. As a result of Five-S's breaches and early termination of the contract, Heartland has incurred damages as alleged above and is entitled to recover interest and attorney's fees.

**COUNT II**
**PROMISSORY ESTOPPEL**

36. Heartland incorporates by reference the allegations in paragraphs 1-35 of the Complaint.

37. Five-S promised to pay the modified freight rate in order to reimburse Heartland for the assist vessel costs and related charges as set forth above.

38. Five-S reasonably expected and/or foresaw that its promises alleged in paragraph 37 would induce Heartland to rely on the promises.

39. Heartland reasonably and substantially relied on the promises, causing Heartland to incur the assist vessel and related charges, all to its detriment.

40. Failure to enforce Five-S's promises would result in injustice.

**COUNT III**
**RESTITUTION / UNJUST ENRICHMENT**

41. Heartland incorporates by reference the allegations in paragraphs 1-40 of the Complaint.

42. Five-S received a substantial benefit from Heartland's continued performance under the terms of the contract, the modified contract, and the expenses incurred by Heartland for assist vessel and related charges.

43. Five-S understood and appreciated the benefits described in paragraph 42.

44. In conferring the benefits described in paragraph 42, Heartland did not intend to act gratuitously.

45. Permitting Five-S to retain the benefits described in paragraph 42 without paying for them would be unjust, unfair, and inequitable.

WHEREFORE, Plaintiff Heartland Barge Management, LLC, prays for judgment in its favor and against Defendant Five-S Group, L.L.C. as follows:

a) For an amount of monetary damages in an amount to be proven at trial and sufficient to compensate Heartland for the contract breaches described above, for the expenses Heartland has incurred and for all other direct financial losses caused to Heartland by Five-S as alleged in Paragraph 31 above, all in an amount sufficient to make Heartland whole and to provide it with the benefits of the bargains it struck with Five-S;

b) For prejudgment interest at the rate of 1 and ½ percent per month as specified in the parties' contract;

c) For post judgment interest at the statutory rate;

d) For an award of attorney's fees and expenses as allowed by the parties' contract;

e) For such other relief to which Heartland is entitled under the circumstances.

GOLDSTEIN AND PRICE, L.C.
and Douglas E. Gossow #35525
By: */s/ Douglas E. Gossow*
701 Market Street, Suite; 1500
St. Louis, Missouri 63101
314-516-1700 (phone)
314-421-2382 (fax)
doug@gp-law.com
*Attorneys for Plaintiff Heartland Barge Management, LLC.*